***********
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to reconsider the evidence, to receive further evidence, or to rehear the parties or their representatives, the Full Commission affirms with minor modifications the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ORDER
Defendants filed a Motion to Allow Additional Evidence, which Chair Pamela T. Young held in abeyance for consideration by the Full Commission panel assigned to review this case, by Order dated February 15, 2008. Defendants seek to present additional evidence, after the ruling of Chief Deputy Commissioner Gheen applying the doctrine of laches, and estoppel as a bar to prevent Defendants from objecting to the consideration of medical evidence developed after the *Page 2 
date of the Mediated Settlement Agreement on the issue of whether the agreement was fair and just and in the best interests of all the parties. Defendants allege that they were unaware laches would be an issue prior to the Deputy Commissioner's ruling. Defendants attached to their Motion an opinion letter from Dr. Brian T. Szura, and requested that it be considered as evidence on the issue of the fairness of the settlement agreement. Plaintiff filed a response to Defendants' Motion. Since the Full Commission is not applying the doctrine of laches or estoppel to this case, Defendants' motion is DENIED.
Plaintiff filed a Motion to Correct Hearing Transcript by adding Stipulated Exhibit 3, which included The First Report of Injury or Illness, as well as other North Carolina Industrial Commission forms, and a letter from J. Alvin Webster, III. Plaintiff also sought to add Plaintiff's Exhibit 3, which includes the original clincher with "post-it" notes attached. Plaintiff's Motion is GRANTED; however, the "post-it" notes attached to the original clincher are not part of the North Carolina Industrial Commission file.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. An employment relationship existed between the parties at all times relevant to this proceeding.
2. American Home Assurance provided workers' compensation insurance coverage at all times relevant to these proceedings. *Page 3 
3. The parties were subject to the North Carolina Workers' Compensation Act at all times relevant to these proceedings, and Defendant-Employer employed the requisite number of employees to be bound by the provisions of the North Carolina Workers' Compensation Act.
4. Plaintiff's average weekly wage is $608.30, yielding a compensation rate of $405.55 per week.
5. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit 1 — Blue Ridge Bone Joint medical records;
 b. Stipulated Exhibit 2 — Carolinas Healthcare System medical records;
 c. Stipulated Exhibit 3 — Carolina Physical Therapy Network medical records;
 d. Stipulated Exhibit 4 — Carolina Surgeons medical records — Dr. Bob Morrow and Dr. Stuart Glassman;
 e. Stipulated Exhibit 5 — Hendersonville Sports Medicine Rehab medical records — Ms. Brenda Culbertson;
 f. Stipulated Exhibit 6 — Miller Orthopedic Clinic medical records — Dr. Jeffrey Mokris and Dr. Glenn Perry;
 g. Stipulated Exhibit 7 — Pardee Memorial Hospital medical records — Dr. John P. Critikos;
 h. Stipulated Exhibit 8 — Perry Barron Orthopedics Sports Medicine medical records — Dr. Glenn Perry;
 i. Stipulated Exhibit 9 — Southeast Pain Care medical records — Dr. Richard I. Park; *Page 4 
 j. Stipulated Exhibit 10 — Union Regional Medical Center medical records — Dr. Virgilio S. Ipapo;
 k. Stipulated Exhibit 11 — Western Carolina Medical Associates medical records — Dr. John Watters;
 l. Stipulated Exhibit 12 — North Carolina Industrial Commission forms and filings;
 m. Stipulated Exhibit 13 — Pharmacy print-outs;
 n. Stipulated Exhibit 14 — Plaintiff's pay stubs;
 o. Stipulated Exhibit 15 — Social Security Administration records;
 p. Stipulated Exhibit 16 — Witness statements;
 q. Stipulated Exhibit 17 — Plaintiff's medical bills;
 r. Stipulated Exhibit 18 — Correspondence from Blue Cross Blue Shield regarding liens, dated October 17, 2005 and January 9, 2006;
 s. Stipulated Exhibit 19 — Report of Mediator;
 t. Stipulated Exhibit 20 — Mediated Settlement Agreement;
 u. Stipulated Exhibit 21 — Proposed Agreement of Final Settlement and Release;
 v. Stipulated Exhibit 22 — Proposed Limited Power of Attorney;
 w. Stipulated Exhibit 23 — North Carolina Workers' Compensation Rating Guide;
 x. Stipulated Exhibit 24 — Award for Recognition of Outstanding Member Service Manager and Plaintiff's name badge; *Page 5 
 y. Stipulated Exhibit 25 — Correspondence from Mr. Boggs to Plaintiff regarding medical leave dated January 18, 2002;
 z. Stipulated Exhibit 26 — Plaintiff's photographic exhibits 1 through 5, inclusive.
 aa. Stipulated Exhibit 27 — Questionnaire of Dr. Jeffrey Mokris dated February 17, 2006.
6. The Chief Deputy Commissioner took judicial notice of the following evidence:
 a. § 8-46 of the North Carolina General Statutes and the accompanying life expectancy tables;
 b. North Carolina Industrial Commission rating guide;
 c. All documents contained in the North Carolina Industrial Commission file.
 * * * * * * * * * * * ISSUES
The issues for determination are: 1. Whether the Mediated Settlement Agreement signed by Plaintiff on October 7, 2003 is a valid settlement agreement, pursuant to § 97-17 of the North Carolina General Statutes, as well as pursuant to North Carolina Industrial Commission Rule 502?
2. Whether the Mediated Settlement Agreement is fair, just, and in the best interests of all of the parties, such that it can and should be approved?
 * * * * * * * * * * *
Based upon the competent and credible evidence of record in this matter, the Full Commission makes the following:
 FINDINGS OF FACT *Page 6 
1. Plaintiff's date of birth is October 21, 1952. Plaintiff is six feet, four inches tall, weighs approximately 265 pounds, and is a non-smoker. Plaintiff is married, has four children, and attended Nazerene Bible College.
2. Plaintiff worked in the construction industry as a pastor whose primary focus was assisting churches with building projects, and then from October 14, 1998 to December 7, 2000, Plaintiff worked for Wal-Mart in various capacities, including pulling carts, and later, as a front end manager in its Sam's Club, located in Matthews, North Carolina. At Wal-Mart and at Sam's Club, Plaintiff's duties involved helping customers to carry heavy merchandise to their vehicles after purchase, including refrigerators, washers, dryers, beds, canoes, generators, and compressors. Plaintiff enjoyed his work, and Defendant-Employer recognized Plaintiff for his outstanding service.
3. Prior to his work with Wal-Mart, Plaintiff had a pre-existing history of chronic right knee problems, having undergone two arthroscopic procedures to his right knee. Prior to December 2000, Plaintiff's pre-existing knee problems never resulted in a significant loss of time from work, Plaintiff was able to engage in a ministry involving church building construction, and Plaintiff was able to work 12-hour days for five days a week on concrete floors at Wal-Mart.
4. Prior to December 2000, Dr. Glenn Perry treated Plaintiff for a number of years, and Dr. Perry eventually referred Plaintiff to his partner, Dr. Jeffrey Mokris. On October 31, 2000, Dr. Mokris examined Plaintiff, and scheduled a right knee osteotomy for December 8, 2000.
5. On November 3, 2000, at approximately 4:00 p.m., Plaintiff was working as a front-end manager for Sam's Club in Matthews, North Carolina. He observed a heavily loaded cart that he believed posed a danger to both the customer pushing it, as well as to other *Page 7 
customers. Plaintiff started to assist the customer, but fell over a taut chain strung in an area where it did not usually appear.
6. Plaintiff fell forward and landed heavily on both knees on a bare concrete floor. The fall was of sufficient force to cause tears to the knees of Plaintiff's trousers. Plaintiff experienced an immediate onset of pain in both knees.
7. Plaintiff promptly reported his fall to his supervisor, but Defendant-Employer did not prepare an accident report for several months. Defendant-Employer does not dispute Plaintiff's account of his fall. Based on the written statement that Mr. Morgan Garver prepared on or about July 2001, Defendant-Employer did not prepare an injury report because Plaintiff "was already seeing a doctor and was on insurance."
8. Plaintiff did not immediately seek medical care as a result of his fall, because Plaintiff's supervisor promptly restricted his work so that he did not have to do the heavy lifting previously required of him. Also, Defendant-Employer requested that Plaintiff not miss any time from work after his fall on November 3, 2000, because of the Christmas rush. In addition, Plaintiff's was waiting to undergo his osteotomy scheduled for December 8, 2000.
9. On December 8, 2000, Plaintiff underwent the previously scheduled high tibial osteotomy to his right knee on an out-patient basis. There were no intra-operative complications.
10. By March 25, 2001, Dr. Mokris noted that the outcome of the right high tibial osteotomy was not ideal, and Dr. Mokris further noted: "I am concerned that he is going on to a non-union."
11. Although Plaintiff had some right knee problems resulting in two surgeries before his November 3, 2000 work injury, the medical records do not indicate any consideration of a total knee replacement prior to the November 3, 2000 work injury. *Page 8 
12. Because of Plaintiff's knee condition, as well as the pain resulting therefrom, Plaintiff did not return to work with Wal-Mart after his December 8, 2000 surgery. Plaintiff did made several unsuccessful attempts to return to work with the Union County Schools and with Samaritan's Purse. Plaintiff applied for and began receiving Social Security disability benefits on January 30, 2004.
13. On June 25, 2001, Dr. Mokris noted the following: "He [Plaintiff] was stepping over a chain at work and tripped and fell injuring his knee. He states it exacerbated his pain at that point. He had some problems prior to that but this obviously did make it worse."
14. On August 13, 2001, Dr. Mokris examined Plaintiff and noted: "He states his knee feels a little bit better but he still is having some significant pain. He is also having some pain in his low back, which he has had off and on since his fall. He brings in a picture of the way he fell and it was actually over a chain and took a pretty significant fall, actually I believe tearing his pants at the time. This injury was between the times that I had seen him in November [sic] and scheduled his surgery." Dr. Mokris anticipated that Plaintiff would probably require total knee replacement of both knees.
15. On September 6, 2001, Plaintiff saw Dr. Mokris' physician's assistant, Mr. Michael Dilello: "He [Plaintiff] had an injury last year in November. I believe November 3rd, in which he was picked up and dropped basically at work by some sort of device and injured both knees and his back. He has continued to have trouble with it." With respect to Plaintiff's left knee, Mr. Dilello stated: "I agree that indeed from the sounds of his injury on November 3rd that it could have caused some of this knee pain exacerbation."
16. On September 10, 2001, Defendants filed a First Report of Injury/Illness with the North Carolina Industrial Commission, which reported that as a result of Plaintiff's November 3, *Page 9 
2000 work injury, Plaintiff suffered a "bruise/contusion" to his "knee(s)" after falling over a chain and landing on his knees, and that "future major med/lost time anticipated." On a Form 61 filed September 4, 2001, Defendants admitted that Plaintiff sustained a compensable work injury when he fell at work on November 3, 2000, but denied that Plaintiff's right knee claim and disability resulted from the fall.
17. On September 10, 2001, Dr. Glenn Perry stated: "His second knee apparently was aggravated as a result of a fall 11/3/00 at Sam's when he fell directly on both knees. He is showing degenerative changes, and I do think that his pre-existing condition was aggravated by the fall, though to what extent it is uncertain."
18. On October 26, 2001, Plaintiff filed a Form 18, alleging injuries to his left knee, to his right knee, and to his back as a result of the November 3, 2000 work injury.
19. Defendant-Employer terminated Plaintiff's employment on or about January 23, 2002.
20. On June 3, 2002, Dr. Mokris noted: "At this point I do feel he has failed conservative treatment regarding his high tibial osteotomy and anti-inflammatory medications. We will schedule him for a right total knee replacement."
21. On July 18, 2002, Plaintiff underwent a right total knee replacement. The surgical, the hospital, and the anesthesia charges alone for the July 18, 2002 right total knee replacement were $36,438.00.
22. In Dr. Mokris' August 21, 2003 medical note, he indicated that Plaintiff's right knee was "doing pretty well," but that "his left knee has gone on to significant degenerative arthritis. He hurt this at the time of his injury also but his right knee was the one that really was the main problem." Dr. Mokris went on to note that at that point, he did not see any alternative *Page 10 
short of total knee replacement for Plaintiff's left knee. Accordingly, Dr. Mokris scheduled the left total knee replacement.
23. On October 7, 2003, Plaintiff participated in a mediated settlement conference for his workers' compensation claim.
24. The mediated settlement conference concluded with the parties signing a pre-printed Mediated Settlement Agreement form providing the following terms of settlement: (a) Defendants would pay the Plaintiff the sum of $30,000.00, subject to an attorney's fee; (b) the parties would execute all necessary "forms and/or a standard Compromise Settlement Agreement;" (c) the settlement documents would be prepared by the Defendants and submitted "within the time prescribed by the Commission;" (d) no issues remained unresolved; (e) each party would pay their own attorney, but Defendants would pay the entire mediation fee; (f) the parties would include a list of medical expenses with the agreement to be drawn; (g) all unpaid, related medical expenses through the date of the Mediated Settlement Agreement would be paid by Defendants; (h) Defendants would only pay, however, unpaid, related medical expenses submitted by Plaintiff no later than November 7, 2003, and the amount to be paid would not exceed "the satisfaction of $3,500.00 in pre-fee schedule medical bills;" (i) the parties considered the interests of any health plan that may have paid medical expenses of Plaintiff, and agreed that their positions as to the payment of medical expenses were reasonable; (j) the parties agreed that Defendant reasonably denied Plaintiff's claim; and (k) the agreement included all material terms, and the agreement was "fair and in the best interests of all the parties."
25. Plaintiff, counsel for Plaintiff, and counsel for Defendants all signed the Mediated Settlement Agreement. *Page 11 
26. On October 9, 2003, two days after the mediated settlement conference, Dr. Perry indicated that Plaintiff was not physically capable of performing a job that allowed him to sit and to stand at his option for eight hours per day, five days per week. On October 15, 2003, Dr. Mokris expressed a similar opinion.
27. Defendants completed an Agreement of Final Settlement and Release (hereinafter referred to as a "Compromise Settlement Agreement") that accurately memorialized the terms of the Mediated Settlement Agreement.
28. On or about December 1, 2003, Defendants transmitted the Compromise Settlement Agreement to Plaintiff's counsel for execution.
29. After the mediated settlement conference, Plaintiff began to question his decision to sign the Mediated Settlement Agreement. Plaintiff ultimately decided that the Mediated Settlement Agreement was not in his best interests and so Plaintiff informed his counsel that he did not want to abide by its terms. Plaintiff refused to sign the Compromise Settlement Agreement prepared by Defendants after the mediated settlement conference because he felt the proposed settlement was unfair and unjust.
30. On or about October 6, 2004, Defendants filed a Form 33, seeking enforcement of the Mediated Settlement Agreement.
31. On November 2, 2004, Plaintiff's previous counsel filed a Motion to Withdraw approved by Order of Executive Secretary Tracey H. Weaver on November 23, 2004.
32. Plaintiff's current counsel filed a Form 33R, requesting that the Mediated Settlement Agreement not be approved because it was not fair, just, or in the best interests of all of the parties. *Page 12 
33. At the time of the mediated settlement conference, Plaintiff was taking Trimox and Celebrex. In addition, Plaintiff had to use a TENS unit during the mediated settlement conference in order to help him manage his pain, and no family member was able to accompany Plaintiff to the mediated settlement conference. The mediation lasted over five hours.
34. There is no medical evidence in the record to support a finding that Plaintiff was unable to effectively participate in all of the decisions he needed to make at the mediated settlement conference. At the hearing before the Chief Deputy Commissioner, Plaintiff's ability to recall the events and his impressions from the mediated settlement conference contradicts his allegation that his mental faculties were impaired to an appreciable degree during the mediation.
35. Plaintiff's testimony and the medical evidence, while sufficient to prove that Plaintiff would certainly be in some degree of pain at the time of the mediated settlement conference, do not establish that he was not mentally aware and/or that he was incapable of understanding the nature of the mediated settlement conference or the important decisions he was making.
36. Plaintiff also contends that his counsel at the time of the mediated settlement conference was deficient in critical aspects.
37. Plaintiff had applied for Social Security disability benefits as of the time of the mediated settlement conference, and thus, he had a reasonable possibility of entitlement to Medicare within 30 months after signing the Mediated Settlement Agreement.
38. Plaintiff contends that his counsel at the time of the mediated settlement conference did not advise him either prior to, or at the time of the mediated settlement conference that federal law requires that no workers' compensation claim can be settled with *Page 13 
respect to a Defendant's liability for future medical care without making reasonable provision for Medicare's interests.
39. The Mediated Settlement Agreement and the Compromise Settlement Agreement (which Plaintiff did not execute) are completely silent as to any consideration of Medicare's interests.
40. At the time of the mediated settlement conference, Plaintiff contends that his counsel either knew, or should have known, that his health insurance carrier through Defendant-Employer's health benefits plan could seek 100 percent reimbursement of the health insurance benefits it paid on Plaintiff's behalf for medical care related to his November 3, 2000 work injury. However, Plaintiff contends that his counsel never made him aware of this fact.
41. At the time of the mediated settlement conference, Plaintiff's left total knee replacement, which Dr. Mokris performed on January 15, 2004, was already scheduled.
42. Plaintiff testified that he felt the monetary amount agreed upon at the mediated settlement conference was unfair because he continued to have significant medical problems. Plaintiff further testified that he ultimately signed the Mediated Settlement Agreement because his counsel at the time encouraged him to execute the agreement.
43. On October 9, 2003, two days after execution of the Mediated Settlement Agreement, and approximately two months before submission of the Compromise Settlement Agreement to Plaintiff for his approval and signature, Dr. Perry completed a questionnaire in support of Plaintiff's claim for Social *Page 14 
Security disability benefits, wherein Dr. Perry indicated that Plaintiff had an impairment that physically disabled him from working. Likewise, on October 15, 2003, Dr. Mokris filled out a questionnaire in support of Plaintiff's claim for Social Security disability benefits, wherein Dr. Mokris indicated that Plaintiff had an impairment that physically disabled him from working.
44. At the hearing before the Chief Deputy Commissioner, Plaintiff submitted into evidence a questionnaire signed by Dr. Mokris on February 16, 2006, more than five years after Plaintiff's right total knee replacement surgery, in which Dr. Mokris opined that Plaintiff aggravated his right knee in connection with the November 3, 2000 work injury. The surgical procedure discussed by Dr. Mokris appears to be the same surgical procedure discussed by Dr. Mokris in his October 31, 2000 pre-injury notes. Dr. Mokris offered no opinion in the February 16, 2006 questionnaire concerning whether the November 3, 2000 work injury necessitated Plaintiff's right total knee replacement surgery.
45. On October 17, 2005, Blue Cross and Blue Shield of South Carolina (hereinafter referred to as "BCBS/SC") made Plaintiff's current counsel aware of a lien in the amount of $34,610.68 for medical costs paid related to Plaintiff's November 3, 2000 work injury. In correspondence dated October 17, 2005, BCBS/SC asserted a "right to recover 100% of the medical costs from the patient if she [sic] receives any payment, judgment, or settlement from the workers compensation carrier." BCBS/SC also asserted that: "This reimbursement claim applies to any payment received regardless of whether such payments are designated as payment for, but not limited to, pain and suffering, medical benefits, lost wages, or other specified damages." Defendants were in a position to know, and reasonably should have known, of the reimbursement provision of their own health plan at the time of the mediated settlement conference.
46. The Mediated Settlement Agreement provides for up to $3,500.00 in reimbursement of unpaid, related medical expenses. BCBS/SC's demand of greater than *Page 15 
$34,000.00 in reimbursement exceeds the amount that the Plaintiff would receive under the Mediated Settlement Agreement, even before payment of attorney fees.
47. At the time of the mediated settlement conference, both Dr. Perry and Dr. Mokris opined in their office notes that Plaintiff's November 3, 2000 work injury caused his bilateral knee problems, although Plaintiff had pre-existing right knee problems which became worse due to the work injury.
48. If Plaintiff's bilateral knee problems and bilateral knee replacements are causally related to Plaintiff's November 3, 2000 work injury, then the evidence suggests that Plaintiff retains a 40 percent impairment for each leg.
49. In the approximately two years and 10 months between the November 3, 2000 work injury and the mediated settlement conference, Plaintiff would have been entitled to temporary total disability benefits and/or temporary partial disability benefits that alone could total approximately $48,677.56, if Plaintiff's injuries are found to be causally related to his work injury, based upon North Carolina Industrial Commission calculations. Thus, the potential value of Plaintiff's claim for accrued temporary total disability benefits and/or temporary partial disability benefits as of the date of the mediated settlement conference, $48,677.56, was in excess of the amount of the settlement attributable to wage compensation.
50. At the time of the Mediated Settlement Agreement, given Plaintiff's age, education, prior work experience, and his medical condition, a reasonable possibility existed that Plaintiff would be totally disabled from competitive employment for the rest of his life.
51. At the time of the mediated settlement conference, Plaintiff's potential total disability benefits had a present value of approximately $235,315.00, based upon Plaintiff's date of birth, October 31, 1952, and a life expectancy of 29.3 years at the date of the signing of the *Page 16 
Mediated Settlement Agreement on October 7, 2003. (A compensation rate of $405.55 per week multiplied by 52 weeks equals $21,088.60; 29.3 years multiplied by $21,088.60 equals $617,895.98. The present value of that potential income stream, discounted at eight percent, equals 11.1584, multiplied by $21,088.60, which equals $235,315.00).
52. As of October 7, 2003, the issue of whether Plaintiff's November 3, 2000 work injury resulted in any compensable injuries was complex and genuinely disputed between the parties. A probability existed that Plaintiff could prove aggravation of pre-existing conditions meriting full payment of compensation benefits under the North Carolina Workers' Compensation Act, and a probability existed that Defendants could prevail on their contention that Plaintiff's work injury, while an injury by accident, did not substantially aggravate Plaintiff's extensive pre-existing conditions, or cause any additional injury, other than minor and transient.
53. Based upon a reasonable forecast of the evidence, the Full Commission finds that as of the date of the mediated settlement conference, the probabilities attenuated to both parties were in relative parity.
54. With respect to whether the Mediated Settlement Agreement is enforceable as a Compromise Settlement Agreement, the Full Commission finds, based upon the greater weight of the evidence, that Plaintiff participated in the mediation; that at the conclusion of the mediated settlement conference, both parties signed the Mediated Settlement Agreement and agreed to execute a Compromise Settlement Agreement setting forth the terms of the Mediated Settlement Agreement in more detail; that there was a meeting of the minds; and that the terms of the Mediated Settlement Agreement were sufficiently definite and certain. Also, Plaintiff did not *Page 17 
prove, by the greater weight of the evidence that he was mentally impaired due to the medication he had taken and his level of pain, in combination with the length of the mediation.
55. The Full Commission finds, based upon the greater weight of the evidence, that the Mediated Settlement Agreement is enforceable as a Compromise Settlement Agreement; however, the Full Commission must still consider whether the settlement agreement is fair, just, and in the best interests of all of the parties.
56. With respect to whether the Mediated Settlement Agreement and the Compromise Settlement Agreement are fair, just, and in the best interests of all of the parties, Plaintiff contends that the following litany of factors, as set forth in more detail above, support a conclusion that the Mediated Settlement Agreement and the Compromise Settlement Agreement Defendants are seeking to enforce are not fair, just, and in the best interests of all of the parties: (a) the subrogation interests of BCBS/SC, which would net Plaintiff no money from the Mediated Settlement Agreement; (b) inadequate compensation for Plaintiff's claims for future wage loss and medical expenses; (c) potential Medicare off-sets; and (d) Plaintiff's contention that he was not at maximum medical improvement and that his left knee replacement was pending at the time of mediated settlement conference. Some of these factors were not completely apparent to the parties at the time that the parties executed the Mediated Settlement Agreement, but were apparent enough to be worthy of consideration.
57. At the time of the mediated settlement conference, Plaintiff knew, or should have known, that since he applied for Social Security disability benefits, he may have a Medicare set aside issue. Further, both Plaintiff and Defendants had reason to know that Defendant-Employer's health insurance plan provided for subrogation of its potential interests, and Plaintiff *Page 18 
knew that the monetary amount agreed upon represented a substantial discount of what might be obtained under the North Carolina Workers' Compensation Act if he prevailed.
58. At the time of the mediated settlement conference, considering Plaintiff's age, education, prior work experience, and his medical condition, the likelihood of Plaintiff being permanently and totally disabled from competitive employment was significant. These are all factors which the Full Commission is required to investigate and to factor into its consideration of whether the Compromise Settlement Agreement is fair, just and in the best interests of all the parties.
59. Based upon the greater weight of the evidence, the Full Commission finds that the Mediated Settlement Agreement and the Compromise Settlement Agreement are not fair, just, and in the best interests of all of the parties.
60. Both parties negotiated this claim at the mediated settlement conference from a position that while Plaintiff sustained a compensable work injury, whether that work injury caused any aggravation or injury related to the subsequent surgeries was questionable.
61. To the extent that the Compromise Settlement Agreement, which was submitted to the Industrial Commission for approval, purports to require certain language as set forth in Item # 11. that the Industrial Commission must include in the "Order Approving Compromise Settlement Agreement," the Full Commission treats such provision only as a recommendation. The Mediated Settlement Agreement complied with Industrial Commission Rule 502(b), even though this is arguably a denied claim, and even though Defendants agreed to pay all unpaid, related medical expenses through the date of the Mediated Settlement Agreement, but then limited its payment obligation to an amount not to exceed $3,500.00 in pre-fee schedule medical *Page 19 
bills, and further limited its obligation to pay to only those medical expenses Plaintiff submitted by November 7, 2003. The Full Commission finds that such deficiencies are subject to waiver.
62. After the mediated settlement conference, but before December 1, 2003, when Defendants submitted the Compromise Settlement Agreement to Plaintiff for his approval and signature, both Dr. Perry and Dr. Mokris had given written opinions stating Plaintiff is physically disabled from working. By October 6, 2004, the date Defendants moved to have the Industrial Commission approve the Mediated Settlement Agreement as a Compromise Settlement Agreement, Plaintiff had already undergone the left total knee replacement. Since the relevant medical reports in existence at the time that the Industrial Commission is asked to approve a Compromise Settlement Agreement must be submitted along with said agreement, all of the October 2003 medical records, including the records concerning Plaintiff's left total knee replacement, would have been considered had Industrial Commission reviewed the Compromise Settlement Agreement on or about December 1, 2003 or October 6, 2004.
63. Based upon the greater weight of the evidence, the Full Commission finds that the Mediated Settlement Agreement and the Compromise Settlement Agreement are not fair, just, and in the best interests of all of the parties and should not be enforced.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Compromise Settlement Agreements, including Mediated Settlement Agreements, "are governed by general principles of contract law."Chappell v. Roth, 353 N.C. 690, 692, 548 S.E.2d 499, 500, reh'g denied,354 N.C. 75, 553 S.E.2d 36 (2001). "It is a well-settled principle *Page 20 
of contract law that a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement."Northington v. Michelotti, 121 N.C. App. 180, 184, 464 S.E.2d 711, 714
(1995). "To be enforceable, the terms of a contract must be sufficiently definite and certain." Miller v. Rose, 138 N.C. App. 582, 587-88,532 S.E.2d 228, 232 (2000).
2. With the adoption of § 97-80 of the North Carolina General Statutes, and of Rule 4(d) of the Rules of Mediated Settlement Conferences, the predicate elements of a settlement agreement at mediation are: (a) an agreement of the parties specifying all the terms bearing on the dispute; (b) reduction of the agreement to writing; (c) execution by all of the parties and by all of their counsel; and (d) submission of the written agreement to the Industrial Commission in proper form for approval. The "agreement" required must be such as to rise to the formation of a valid contract. Chapel v. Roth, 353 N.C. 690,548 S.E.2d 499 (2001); McNair v. Goodwin, 262 N.C. 1, 136 S.E.2d 218
(1964). A Mediated Settlement Agreement that fully complies with Rule 502(2) of the Workers' Compensation Rules constitutes a valid Compromise Settlement Agreement, subject to approval by the Industrial Commission, pursuant to Rule 502(1) of the Industrial Commission Rules. Lemly v.Colvard Oil Company, 157 N.C. App. 99, 577 S.E.2d 712 (2003).
3. The language of the Mediated Settlement Agreement in the present case clearly states that the parties agreed to settle Plaintiff's claim for a definite monetary amount, and provided for the payment of a limited amount of medical expenses in return for a final and a complete settlement of Plaintiff's workers' compensation claims. The Mediated Settlement Agreement in this case is at least as definitive as the Mediated Settlement Agreement in Lemly, and constitutes a valid contract. Lemly, 157 N.C. App. 99, 577 S.E.2d 712 (2003). *Page 21 
4. To the extent that Plaintiff contends his various medical conditions, prescription medications, and the length of the mediated settlement conference impaired his mental capacity to enter into the Mediated Settlement Agreement, such contentions are not persuasive. Plaintiff's testimony, standing alone, is insufficient to establish that he did not understand the nature of the mediated settlement conference, or the scope, effect and nature of the negotiations. No medical evidence from an expert was presented assessing Plaintiff's mental capacity on the date that he executed the Mediated Settlement Agreement. The greater weight of the evidence establishes that Plaintiff had sufficient mental capacity to contract; that Plaintiff knew what the Mediated Settlement Agreement was about and that Plaintiff had the capacity to understand the nature of the act in which he engaged, as well as its scope and effect, or its nature and its consequences. Ridings v. Ridings, 55 N.C.App. 630,286 S.E.2d 614 (1982).
5. To the extent Plaintiff contends that Defendants' First Report of Injury or Illness (Form 19) filed on September 10, 2001 essentially admitted his claim and that Defendants are thereby precluded from thereafter denying his claim in order to obtain a settlement that is unjust, this contention is unpersuasive. The information contained in the Form 19 as to the mechanism of any alleged accident is not an admission, pursuant to Rule 104 of the North Carolina Industrial Commission Rules. "The employer may record the employee's or another person's description of the injury on the Form 19 without admitting the truth of the information." Id.
6. Plaintiff's contention that the proposed Mediated Settlement Agreement does not meet the requirements of N.C. Gen. Stat. § 97-17(a), which requires that a settlement provide for compensation in accordance with the provisions of Article 97, is not persuasive. At the time of the mediated settlement conference, the issue in dispute was whether plaintiff's injury by accident produced any consequence that would require the payment of any disability or medical *Page 22 
benefits. The resolution of such a dispute through compromise is fully in accord with N.C. Gen. Stat. § 97-17(a).
7. Where a valid Mediated Settlement Agreement exists, the Industrial Commission may, in its discretion, approve the agreement if it is found to be fair and just and in the best interests of all the parties. N.C. Gen. Stat. § 97-17(b)(1); NCIC Rule 502.
8. The greater weight of the competent and credible evidence of record establishes that the Mediated Settlement Agreement executed on October 7, 2003 is not fair, just and in the best interests of all of the parties. N.C. Gen. Stat. § 97-17. Due to the subrogation lien, Plaintiff is likely to receive no benefit from the settlement agreement. Medicare's potential interests were not included in the Mediated Settlement Agreement language. Also, since the Industrial Commission's review of the Compromise Settlement Agreement would have been based on all of the "medical, vocational, and rehabilitation reports known to exist" at the time said agreement was submitted for approval, additional fairness issues exist, relating to whether the compensation is adequate, considering the extent of Plaintiff's disability. I.C. Rule 502(3)(a) (2003).
9. Defendants' contention that only those medical records of treatment existing prior to October 7, 2003, the date of the mediated settlement conference, should be considered in evaluating whether or not the settlement agreement reached was just and fair, is also unpersuasive. "At the hearing on a motion to set aside the agreement, the Commission must determine the fairness and justness of the agreement from the medical evidence filed with the agreement at the time it was originally submitted to the Commission for approval." Lewis v. Craven RegionalMedical Center, 134 N.C. App. 438,441, 518 S.E.2d 1,4, (1999)). The same requirement would appear to apply on a motion to enforce a settlement agreement. Defendants would not have submitted the Compromise Settlement Agreement herein to the Industrial *Page 23 
Commission for approval before December 1, 2003 and they did not actually move to enforce the agreement until October 6, 2004.
10. The statute in existence in 2003 required that all agreements be accompanied by a full and complete medical report and the 2003 version of Industrial Commission Rule 502(3)(a) required that all medical, vocational and rehabilitation reports known to exist at the time the agreement is submitted to the Industrial Commission for review and approval must be submitted to the Commission along with the Compromise Settlement Agreement. Considering all of the medical records and vocational reports, the greater weight of the evidence establishes that the Mediated Settlement Agreement and the Compromise Settlement Agreement would not have been fair and just and in the best interests of all the parties had the settlement been submitted for approved on or about December 1, 2003, or October 6, 2004, when Defendants first sought Industrial Commission approval. Therefore the Full Commission finds that the Mediated Settlement Agreement and the Compromise Settlement Agreement should not be enforced. N.C. Gen. Stat. § 97-82 (2003).
11. The Industrial Commission may tax the costs in its discretion.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants' motion to enforce the Mediated Settlement Agreement executed on October 7, 2003 as a Compromise Settlement Agreement is DENIED.
2. This matter is remanded to the Deputy Commissioner Section for hearing on the remaining issues raised by the parties. *Page 24 
3. No costs are taxed at this time, as the claim was bifurcated.
This the ___ day of September 2008.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG CHAIR
 S/___________________ BUCK LATTIMORE COMMISSIONER